ROBERTO'S FRUIT MARKET, INC., Four Star Video, Inc.; Penguin Tires, Inc., W.A.L.S.U. Inc.; Cross Island Sanitation, Inc.; PGS Carting Co., Inc., Plaintiffs,

v.

Richard H. SCHAFFER, individually, Doug Jacob, individually; Ron Kluesener, individually; Adam Barsky, individually; Babylon Source Separation Commercial, Inc., Jamaica Ash & Rubbish Removal Co., Inc.; Jet Sanitation Service Corp.; S.P.F. Carting Corp.; Mets Roll–Off Service, Inc.; Trinity Transportation Corporation; Omni Recycling of Babylon, Inc.; Omni Recycling of Westbury, Inc.; Westbury Paper Stock Corp.; Emedio Fazzini; Anthony Core; Domenick Testa; Patricia DiMatteo; Sidney Fenster, Joseph Petrizzo; and John Pagano, Defendants.

No. CV 97–4764(ADS).

United States District Court, E.D. New York.

July 16, 1998.

Kevin Maldonado, Pound Ridge, NY, for Plaintiffs.

Rosenman & Colin, New York, NY, for Defendant Adam Barsky; Howard Wilson, of counsel.

Stephen P. Scaring, Garden City, NY, for Defendants Jamaica Ash & Rubbish Removal Co., Inc., Jet Sanitation Service Corp., Emedio Fazzini, Patricia DiMatteo, Anthony Core.

John F. Carman, Garden City, NY, for Defendant Ronald Kluesener.

William D. Wexler, North Babylon, NY, for Defendant Doug Jacob.

Anthony Core, Westbury, NY, for Defendants Babylon Source Separation Commercial, Inc., Trinity Transportation Corp., Omni Recycling of Babylon, Inc., Omni Recycling of Westbury, Inc., Westbury Paper Stock Corp.

Kevin Keating, Garden City, NY, for Defendant Domenick Testa.

Nixon, Hargrave, Devans & Doyle, Garden City, NY, for Defendants Richard H. Schaffer, Adam Barsky, Doug Jacob, and Ron Kluesener; Frank L. Amoroso, of counsel.

Jaspan, Schlesinger, Silverman & Hoffman, LLP, Garden City, NY, for Defendants Mets Roll–Off Service, Inc., S.P.F. Carting Corp., Sidney Fenster, Joseph Petrizzo, John Pagano; Michael E. White, Laurel R. Kretzing, of counsel.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case involves the disposal of rubbish. Specifically, it is about the many tons of waste produced each year by commercial businesses in the Town of Babylon, and how certain companies were awarded valuable Town contracts for its removal, incineration and recycling The plaintiffs' First Amended Complaint ("the Complaint") alleges violations of the Racketeer Influenced and Cor-

rupt Organization Act ("RICO"), 18 U.S.C. § 1962, and a state law cause of action for common law fraud. These claims stem from an alleged conspiracy by crooked Town officials to award lucrative contracts to corrupt garbage haulers by bribes, back-door schemes and illegal campaign contributions, for the purpose of charging customers jacked-up prices for garbage removal and to steal business from the legitimate haulers who previously serviced the Town. Presently before the Court are four, separately-drafted motions to dismiss under Rules 9(b) and 12(b)(6), each of which is joined by the other defendants: (1) a motion submitted on behalf of SPF Carting Corporation ("SPF"), Mets Roll–Off Service, Inc. ("Mets"), Sidney Fenster ("Fenster"), Joseph Petrizzo ("Petrizzo") and John Pagano ("Pagano"), (2) a notion by defendant Adam Barsky ("Barsky"); (3) a motion by defendants Richard H. Schaffer ("Schaffer"), Doug Jacob ("Jacob"), and Ron Kluesener ("Kluesener"); and (4) a motion by defendants Babylon Source Separation Commercial, Inc. ("BSSCI"), Jamaica Ash & Rubbish Removal Company, Inc. ("Jamaica Ash"), Jet Sanitation Service Corporation ("Jet"), Trinity Transportation Corporation ("Trinity"), Omni Recycling of Babylon, Inc. ("Omni–Babylon"), Omni Recycling of Westbury, Inc. ("Omni–Westbury"), Westbury Paper Stock Corporation ("Westbury Paper"), Emedio Fazzini ("Fazzini"), Anthony Core ("Core"), Domenick Testa ("Testa") and Patricia DiMatteo ("DiMatteo").

## I. BACKGROUND

### A. The Town's Creation of a Commercial Garbage District

Many of the details surrounding the Town's creation of a commercial garbage district, which is the crux of this dispute, were set forth by the Second Circuit in *USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272, 1276–80 (2d Cir.1995), where licensed garbage collectors unsuccessfully challenged the Town's waste management system on commerce clause grounds. Since the creation of the garbage district is critical to an understanding of the present dispute, those and related details warrant discussion in the opinion.

### 1. The Babylon Incinerator

In 1983, the Town began considering building a garbage incinerator ("the Incinerator") as a garbage disposal option, in response to the New York Legislature's directive that the Town close its environmentally harmful dumps. *USA Recycling, Inc. v. Town of Babylon,* 66 F.3d at 1277. After soliciting proposals for the construction and operation of the Incinerator, the Town awarded the contract to Ogden Martin Systems, Inc. ("Ogden"), a New Jersey corporation. The Town financed construction of the Incinerator with tax-exempt bonds issued by the Town of Babylon Industrial Development Agency (the "Agency"), which the Town controls. The land on which the Incinerator was built is owned by the Town, leased to the Agency, and subleased to Ogden. The Agency owns the Incinerator and leases it to Ogden, which operates it. *Id.* A 1985 Service Agreement between Babylon and Ogden provides that the Town has an unconditional obligation to pay Ogden a Service Fee for operating the Incinerator, regardless of whether any garbage is processed there. *Id.* at 1277–78. Through the Service Fee, Babylon pays for debt service on the bonds, operation and maintenance expenses, and various pass-through costs. Under the Agreement, the Town holds exclusive rights to accept garbage for disposal at the Incinerator, and to set and collect fees for disposal. Ogden is required to process whatever garbage the Town accepts for disposal. In turn, Babylon must deliver a minimum of 225,000 tons of garbage each year to the Incinerator. *Id.*

### 2. Babylon's Pre–Carbone Garbage Collection and Disposal System

In 1986, the Town created a Residential Garbage Improvement Area (the "Residential District") to provide municipal garbage collection and disposal services to all Town residents, pursuant to New York Town Law §§ 54 and 198 (McKinney 1965 & Supp.1986). In 1987, following a competitive bidding process, the Town contracted with Babylon Source Separation, Inc. ("Babylon Source"), to collect residential refuse and to provide recycling services in the Residential District. That same year, the Town passed a flow

control ordinance that required all solid waste collected within Babylon to be disposed of at a location designated by the Town, and specified the Incinerator as the only permissible disposal site. The ordinance also required garbage haulers to pay "tipping fees" to the Town for each ton of garbage delivered there. The revenues from these fees offset some of Babylon Source's costs under its Service Agreement with Ogden.

Several years later, however, the United States Supreme Court struck down a similar town ordinance which mandated the processing of all solid waste at a local, privately owned transfer station. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). In response to the *Carbone* opinion, Babylon created the Commercial Garbage Collection District No. 2 (the "District"), covering most commercial properties in the Town. The Town then mandated the uniform municipal collection and disposal of waste generated in the District, replacing the myriad contracts between individual businesses and the seventeen haulers licensed to collect commercial waste in Babylon. *Id.* 66 F.3d at 1278–79.

In 1994, following a competitive, public bidding procedure—although the plaintiffs allege that the bid was rigged—the Town entered a five-year Service Agreement with the defendant Babylon Source Separation Commercial, Inc. ("BSSCI") to provide garbage hauling services to all improved commercial property within the District. Under the Service Agreement, the Town granted BSSCI an exclusive license to collect commercial garbage within the District. The Service Agreement provides that the Town must pay BSSCI a base fee of $22.75 per week for basic service to each parcel, plus additional fees for collection of garbage above the base amount. Also, the Service Agreement permits BSSCI, at no charge, to dispose of up to 96,000 tons of garbage per year at the Incinerator and unlimited amounts of recyclable material at the town recycling facility. The Service Agreement further provides that if BSSCI dumps more than 96,000 tons at the Incinerator, it is obligated to "pay the prevailing tipping fee to the Town at the time of such delivery." BSSCI has the option to deliver commercial refuse elsewhere, but it must bear those disposal costs itself. *Id.*

To finance these collection and disposal services in the District, the Town imposed a $1500 "annual benefit assessment" against each improved parcel of commercial property within the District. All such parcels are entitled to "basic service" from BSSCI, consisting of weekly collection of one cubic yard of commercial refuse and one-half cubic yard of recyclables. The property owner may allocate this basic service to one commercial establishment per parcel. If there is more than one commercial establishment on the parcel, or a business requires more than basic service, a user fee is charged for each additional cubic yard of garbage. *Id.*

### 3. The Recycling Facility

According to the Complaint, in 1992, the Town undertook to build a recycling facility ("The Recycling Facility") to comply with the New York State Waste Management Act and respond to mounting solid waste management problems. Like the Incinerator, construction of the Recycling Facility was financed through municipal bonds.

When the Recycling Facility opened, it was operated by Babylon Recycling Center, Inc. ("BRCI"), a company selected by competitive bid. Several years later, the Recycling Facility experienced financial difficulty and BRCI filed for bankruptcy in January 1994. Evidently, the Bankruptcy Court determined that the Recycling Facility should continue to operate, and following another bidding process, awarded an interim contract to the defendant Omni–Westbury, which began overseeing the Recycling Facility on or about September 30, 1994. Just over a year later, on or about November 3, 1995, the Bankruptcy Court authorized BRCI to enter an agreement under which defendant Omni–Babylon became the Recycling Facility's owner and permanent operator (See Complaint at ¶¶ 130–143).

### B. The Complaint

The plaintiffs commenced this action on August 18, 1997 by filing a complaint (the

"Initial Complaint"). After various defendants moved to dismiss the Initial Complaint, the plaintiffs filed the First Amended Complaint (which the Court will refer to, simply, as "the Complaint"). Evidently, the amendments addressed some of the issues raised in the defendants' motions, such as their argument that the claims against certain municipal defendants should be dismissed. The defendants' original moving papers were withdrawn, and the second set of motions to dismiss which presently are before the Court followed.

### 1. The Plaintiffs

The Complaint presents the plaintiffs in two, distinct categories, which the plaintiffs indicate they will seek to certify as class representatives: (1) commercial property owners, such as Roberto's Fruit Market, Inc ("Roberto's"), Four Star Video, Inc. ("Four Star"), Penguin Tires, Inc. ("Penguin") and W.A.L.S.U., Inc. ("W.A.L.S.U."), who assert that the creation of the Garbage District and the award of the Service Agreement to BSSCI has resulted in increased rates for the collection and disposal of their refuse; and (2) commercial trash haulers, including Cross Island Sanitation ("Cross–Island") and PGS Carting ("PGS"), who complain about the loss of their commercial trash collection contracts.

### 2. The Defendants

The Complaint also divides the defendants into two groups. The first, characterized as the "Town Defendants," consists of Babylon officials who allegedly were instrumental in awarding the bid to BSSCI: Schaffer, Supervisor of the Town; Jacob, Comptroller and Finance Director of the Town; Barsky, former Town Comptroller; and Kluesener, Commissioner of Environmental Control of the Town.

The second, referred to as the "Commercial Defendants," includes the businesses which purportedly benefitted from the Town's creation of the Commercial Garbage District: BSSCI, which is alleged to be comprised of defendants Jamaica Ash, Jet, S.P.F., and Mets; Jet's Chairperson and owner, DiMatteo; S.P.F.'s Chairperson, owner and manager, Fenster; Petrizzo, Chairman of Mets; Pagano, an alleged owner and manager of Mets; Trinity; Westbury Paper; Omni–Babylon; Omni–Westbury; Testa, Chairman of Trinity; Core, a manager, officer and owner of Trinity, Omni–Babylon, Omni–Westbury, Westbury Paper, and Fazzini, an owner and manager "who has complete and unfettered control over" Omni–Westbury, Omni–Babylon, Trinity, Westbury Paper, Trinity, BSSCI, Jamaica and Jet.

### 3. The Alleged RICO Conspiracy

Stated broadly, as it is in the Complaint, the plaintiffs allege that "The Town Defendants, joined with the Commercial Defendants to collectively form the BSSCI/Omni Enterprise for both their political and personal gain.... [T]his illicit relationship has resulted in the commission of several RICO predicate act crimes including ... numerous acts of bribery, accepting bribes, mail fraud and wire fraud. In addition to these RICO predicate acts, the Town Defendants have committed a litany of other crimes, including violations of election law, conspiracy to fix public bids, violations of public procurement laws, fraud, and creating and filing false records." (Complaint, ¶ 7). Reduced to its essence, the plaintiffs' theory is that the Commercial Defendants provided cash bribes and illegal campaign contributions to the Town Defendants who, in exchange, established the Commercial Garbage District and awarded an exclusive contract for the removal of trash to the Commercial Defendants.

## II. DISCUSSION

### A. Rule 8: The Standard

While the defendants do not expressly move for dismissal under Rule 8, the Court raises the issue, *sua sponte*, based on its review of the Complaint.

Fed.R.Civ.P. 8 provides, in relevant part, that a complaint "shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief" Rule 8(a)(2). In addition, Rule 8(e)(1) provides that "[e]ach averment of a pleading shall be simple, concise, and direct." The purpose of Rule 8 is to ensure that courts and adverse parties can understand a claim and frame a

response to it. The Second Circuit has observed that:

> The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial. The statement should be short because "unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."

*Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir.1988) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1281, at 365 [1969]) (additional internal citations omitted). "When a complaint fails to comply with these requirements, the district court has the power, on motion or *sua sponte*, to dismiss the complaint or to strike such parts as are redundant or immaterial." *Simmons v. Abruzzo*, 49 F.3d 83, 86–87 (2d Cir.1995) (citing *Salahuddin v. Cuomo*, 861 F.2d at 42). "Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* (quoting *Salahuddin*, 861 F.2d at 42). The Second Circuit has instructed that if the District Court dismisses the complaint for failure to comply with Rule 8, it generally should afford the plaintiff leave to amend *Id.* (citing 5 C. Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1281, at 366–67; 2A Moore's Federal Practice P8.13, at 8–81 to 8–82 n. 38).

The Court finds several opinions from courts within this Circuit to be instructive. For example, in *Moscowitz v. Brown*, 850 F.Supp. 1185 (S.D.N.Y.1994), the Court dismissed a complaint after giving the plaintiff three opportunities to replead. The amended complaint contained an astounding array of charges, ranging from religious discrimination to defamation to insider trading to prostitution, *Id.* at 1190. The plaintiff also charged that the New York City Police Department, his former employer, was "an effective subsidiary" of Goldman, Sachs & Co., a prominent New York investment bank. *Id.*

The Court concluded that the complaint was "a labyrinthian prolixity of unrelated and vituperative charges." *Id.* (quoting *Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir.1972) (per curiam), *cert. denied*, 411 U.S. 935, 93 S.Ct. 1911, 36 L.Ed.2d 396 [1973]). Similarly, in *Lonesome v. Lebedeff*, 141 F.R.D. 397 (E.D.N.Y.1992), a pro se plaintiff brought an action alleging a conspiracy to violate his civil rights pursuant to 42 U.S.C. § 1983. In a complaint containing 452 paragraphs in 62 pages, he made numerous "vague and incomprehensible allegations." *Id.* 141 F.R.D. at 398. The Court dismissed he complaint pursuant to Rule 8, and granted the plaintiff leave to file an amended complaint within twenty days.

In *Salahuddin*, the Court of Appeals found that the district court acted within its discretion in dismissing a complaint spanning "15 single-spaced pages and contain[ing] explicit descriptions of 20–odd defendants." 861 F.2d at 43. Nevertheless, the Court of Appeals assigned error to the district court's failure to permit leave to amend, since, despite its length, the complaint "clearly plead[ed] at least some claims that cannot be termed frivolous on their face." *Id.*

With these standards in mind, it becomes "pointedly clear that the complaint ... runs afoul of Rule 8. Indeed, the prolixity of the pleading is greatly compounded by its [occasionally] vague and incomprehensible allegations. Forcing defendants to answer such a pleading would fly in the face of the very purposes for which Rule 8 exists, [by placing] an unjustified burden on the court and the [parties] who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Lonesome v. Lebedeff*, 141 F.R.D. at 398 (internal citations omitted).

### 1. The Prolix Nature of the Complaint

While it was no model of brevity or clarity, the plaintiff's Initial Complaint was a relatively modest 51 pages and 227 paragraphs. The Amended Complaint has swelled to 71 pages and 284 paragraphs Attached to the Amended Complaint, and, according to the plaintiffs, incorporated by reference in its entirety, is an affidavit of former Assistant

Town Attorney James L. Manfre, which in and of itself exceeds 37 pages and 101 paragraphs. Viewed collectively, the Complaint tips the scales at a whopping 108 pages and 385 paragraphs.

In the Court's opinion, the complaint is excessively long-winded and redundant. Despite the inclusion of twenty defendants, the Court concludes that the relatively straightforward bribery scheme that forms the basis of plaintiffs'' allegations in no way justifies this wordiness. Significantly, Judge Dearie has observed that "The fact that plaintiffs assert [ ] RICO claims does not justify [a] verbose complaint." *Pahmer v. Greenberg*, 926 F.Supp. 287, 294 n. 2 (E.D.N.Y.1996), *affirmed sub nom., Shapiro v. Cantor*, 123 F.3d 717 (2d Cir.1997) (citing *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 776 (7th Cir.1994)). "[A]lthough RICO complaints often might need to be somewhat longer than many complaints, RICO complaints must meet the requirements of Rule 8(a)(2) and Rule 8(e)(1)." *Id.; see also Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir.1990) (holding in a RICO case that Rule 9(b)'s particularity requirement "must be read together with [R]ule 8(a)") (citations omitted).

The confusion occasioned by the rambling nature of the Complaint is compounded by its disorganization. The plaintiffs' eschew the traditional practice of devoting a few descriptive paragraphs to each defendant at the outset of the Complaint to explain their status, nature, and general significance. Instead, the Complaint describes the twenty defendants in a dizzying web of 96 paragraphs (¶¶ 33–129). This layout makes it difficult for the Court and parties to comprehend who each defendant is, and the relationship of each defendant to the others.

### 2. *Inclusion of Irrelevant, Inflammatory Matters*

One explanation for the unnecessary length of the Complaint is that it is littered with unnecessary, vague and inflammatory language in the nature of trash-talking. To cite just a few examples, the complaint states that: (1) "Upon information and belief, SPF and Fenster were identified by the Justice Department, in the Rand Report as having

ties to organized crime" (¶ 82); (2) "Upon information and belief, a grand jury has been empaneled to investigate Schaffer, Jacob, Barsky and Kluesener's dealings with the various BSSCI/Omni Enterprise parties" (¶¶ 225); (3) "Upon information and belief, on or about April 1997, grand jury subpoenas had been issued to the Town of Babylon through the District Attorney's Office for records concerning the Town's landfill, recycling and garbage district operations" (¶ 226–27); and (4) "Upon information and belief, there is an ongoing federal investigation into possible corruption in Babylon concerning whether Schaffer Administration officials illegally favored a plumbing firm headed by a former house mate of Schaffer and whether officials pressured builders into using the firm." (¶ 232). In addition, various portions of the Complaint, including, but not limited to paragraphs 4, 210, 211, 213, and 228, set forth allegedly criminal conduct by the defendants which, the plaintiff concedes (¶¶ 7, 227), are not RICO predicate acts. Such references to purported investigations, reputed "ties to organized crime," or crimes which do not constitute predicate acts under RICO, have no place in the Complaint. Even assuming such allegations were true, they are interesting side issues which bear no relation to a RICO claim. "Congress did not deploy RICO as an instrument against all unlawful acts. It targeted only predicate acts catalogued under section 1961(1). Admittedly, RICO is to be read broadly to effect its purpose.... Its purpose, however, is to target RICO activities, and not other conduct." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir.1990) (citation omitted). The dozens of paragraphs devoted to such tangents make it impossible for the defendants to file a responsive pleading and for the Court to conduct orderly proceedings on this case, all in contravention of Rule 8. They also should be stricken from the Amended Complaint under Rule 12(f), which prohibits "immaterial, impertinent and scandalous" matters.

For the foregoing reasons, the Complaint in its present form is hereby dismissed, without prejudice, as prolix and argumentative in violation of Rules 8 and 12(f), and the plain-

tiffs are granted leave to replead within 30 days of the date of the entry of this Order. In so doing, the Court rejects the defendants' suggestion at oral argument that the plaintiffs should be denied leave to amend the complaint. The Second Circuit has instructed that where a district court exercises its discretion to dismiss a complaint under Rule 8, the plaintiffs generally should be granted leave to amend. *Salahuddin,* 861 F.2d at 43. This is especially true where, as here, the Complaint is not entirely "incomprehensible, and it ... pleads at least some [aspects of the plaintiffs'] claims that cannot be termed frivolous on their face." *Id.* While the plaintiffs have to pare the Complaint significantly to meet the mandates of Rule 8, it cannot be said that this will be an impossible or futile effort.

By the same token, in drafting the amendments, the plaintiffs are admonished that, if their second amended complaint merely recycles the prior two, it will be dismissed with prejudice. The Second Amended Complaint shall meet the requirements of Rule 8 to set forth a short and plain statement of the same claims asserted and a simple statement of the same grounds on which the same relief is demanded, without duplication. In view of this decision, the defendants' motions for dismissal pursuant to Rules 9 and 12(b) of the Federal Rules of Civil Procedure are denied, without prejudice and with leave to renew after plaintiffs file a second Amended Complaint.

## B. The Elements of a RICO Claim

While the defendants' motions to dismiss must await the filing of the Second Amended Complaint, several valid points are raised in their Memoranda which warrant discussion, especially in view of the plaintiffs' opportunity to replead The Court does not address each find every theory advanced by the defendants in their motions. Instead, the Court will confine its observations to the defendants' principal contention, namely, that the plaintiffs' pleading style makes it virtually impossible to ascertain which defendants allegedly are responsible for what conduct, or to determine whether the plaintiffs have stated a cause of action against the various defendants. In an effort to provide the plaintiffs with guideposts in redrafting the Complaint, the Court begins by setting forth the applicable standards in RICO causes of action, and then explaining why, in its view, the Complaint in its present form is insufficient in many key respects.

### 1. *RICO: The Standards*

The threshold pleading requirements of a private action under RICO, Section 1962, were set forth by the Second Circuit in *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984), as follows:

> To state a claim for damages under RICO a plaintiff has two pleading burdens. First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 (1976), commonly known as "criminal RICO." In so doing, he must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.... Plaintiff must allege adequately defendant's violation of section 1962 before turning to the second burden—*i.e.,* invoking RICO's civil remedies of treble damages, attorneys fees and costs.... To satisfy this latter burden, plaintiff must allege that he was "injured in his business or property by reason of a violation of section 1962." (citations omitted).

*See also Pinnacle Consultants v. Leucadia Nat'l Corp.,* 101 F.3d 900, 904 (2d Cir.1996) (discussing the standards). Section 1962 prohibits, under subsections (a) through (d), the following: (a) the use of income "derived ... from a pattern of racketeering activity" to acquire an interest in, establish, or operate an enterprise engaged in or whose activities affect interstate commerce; (b) the acquisition of any interest in or control of such an enterprise "through a pattern or racketeering activity"; (c) the conduct or participation in the conduct of such an enterprise's affairs

"through a pattern of racketeering activity", and (d) conspiring to do any of the above. 18 U.S.C. § 1962(a)–(d); *see also GICC Capital Corp. v. Technology Finance Group, Inc.,* 67 F.3d 463, 465 (2d Cir.1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996). Here, the complaint alleges a substantive RICO violation under Section 1962(c), and a conspiracy claim under Section 1962(d). The existence of a "pattern of racketeering activity" is a requirement under both prongs.

To establish such a pattern, "a plaintiff must plead at least two predicate acts, show that the acts are related and that they amount to, or pose a threat of, continuing criminal activity." *Id., H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). RICO is aimed at "racketeering activity," which the statute defines, in relevant part, as "any act or threat involving ... bribery ... which is chargeable under State law and punishable by imprisonment for more than one year ... " 18 U.S.C.A. § 1961(1)(A), and as certain acts indictable under Federal law, including mail and wire fraud. 18 U.S.C.A. § 1961(1)(B).

### 2. *The RICO Claims Stated in the Complaint*

The Complaint alleges essentially three separate categories of predicate acts: (1) bribery under New York Penal Law § 200.00; (2) mail fraud; and (3) wire fraud. As noted previously, it is all but impossible to focus on the relevant paragraphs among the maze of allegations in the rambling Complaint. With that caveat in mind, it appears that the predicate acts are pleaded in the Complaint as follows:

143. Upon information and belief, Barsky and Jacob, as well as several of the Commercial Defendants meet [*sic*] at a restaurant near to Jacobs [*sic*] Pelham Manor home to discuss the scheme. On or about the time of this meeting, Barsky, Jacob, Schaffer and Kluesener received and took illicit cash payments and illicit campaign contributions from the BSSCI/

Omni Enterprise Commercial Defendants in exchange for political influence.

. . .

243. The Commercial Defendants conspired to bribe the Town Defendants and the principals of the Commercial Defendants did in fact forward bribes in exchange for influence. Bribery is a predicate act under the RICO statute. Under New York [S]tate Law the crime of Second Degree Bribery, New York State Penal Law § 200.00 [*sic*] * is a crime punishable by more than one year in prison and as such is accordingly a crime that is a RICO predicate act.

245. A person is guilty of Bribery the Second Degree [*sic*] *:

"... when he confers, or offers or agrees to confer, any benefit upon a public servant upon an oral agreement or understanding that such public servant's vote, opinion, judgment, action, decision, or exercise of discretion as a public servant will thereby be influenced." N.Y. Penal Law § 200.00.

246. Upon information and belief, Fazzini, Core, Testa, DiMatteo, Fenster, Pettrizzo and Pagano have each committed numerous violations of the above N.Y. Penal Law involving cash bribes and bribes in the form of illegal campaign contributions.

247. Upon information and belief, and subject to further evidentiary support following discovery, Barsky received bribes while employed as the Comptroller from certain of the Commercial Defendants in relationship to the separate Residential Garbage District.

248. Upon information and belief, these bribes [were] received by Barsky in exchange for influence by him and other public officials in their duties as public servants.

249. Upon information and belief, Barsky conspired with Jacob, Kluesener and Schaffer, following his departure from Town Government, for the acceptance of illicit bribes and campaign contributions by these officials in exchange for influence in

---

* This appears to be a typographical error, since Bribery in the Second Degree is set forth in P.L.

§ 200.03. Penal Law § 200.00 defines Third Degree Bribery.

their decisions as public officials concerning the Commercial Garbage District.

250. Conspiracy to commit bribery is a separate predicate act under RICO.

251. The bribes and/or illegal campaign contributions accepted by Schaffer, Jacob and Kluesener from the Commercial Defendants that comprise the BSSCI/Omni Enterprise in exchange for influence in the award of the [ ] Contract is racketeering activity as defined by the RICO statute and violations of the New York Penal Code. Each and every bribe or illicit payment received and offered is a predicate act under the RICO Statute.

252. Upon information and belief, at least two such payments were received on behalf of each of Schaffer, Jacob and Kluesener. Each illicit payment received by Schaffer, Jacob and Kluesener constitutes a predicate act under RICO.

253. Upon information and belief, Jacob, Schaffer and Kluesener conspired to accept bribes and illegal campaign contributions in exchange for influence in the adoption of the Commercial Garbage District and the award of the Exclusive Contract.

254. Upon information and belief, each and all of the Commercial Defendants that comprise the BSSCI/Omni Enterprise conspired to, and participate[d] in the illegal payment of bribes and illicit campaign contributions. Upon information and belief, each Commercial Defendant had full knowledge of at least two such payments to public officials and/or their agents in the Town of Babylon in exchange for influence in the implementation and award of the Commercial Garbage District.

255. The potential for the Commercial Defendants to offer other and further bribes and illicit payments in attempt to further influence Schaffer, Jacob and/or Kluesener is probable.

. . .

257. In addition to the above enumerated acts, Schaffer, Jacob and Kluesener have engaged in countless acts of mail and wire fraud in the course [of] establishing the Commercial Garbage District and awarding the Exclusive Contract to the Commercial Defendants.

The Complaint goes on to describe numerous mailings and billings to the Customer Plaintiffs which purportedly constitute mail fraud, in that they "actively concealed" that BSSCI rigged the bid by paying "bribes" and "illicit campaign contributions" to the Town Defendants (Complaint, ¶¶ 257[a]–[e] ). As far as the Court is able to discern, the sole allegation in the Complaint relating to wire fraud is contained in a single paragraph, which states "The Defendants engaged in numerous phone conversations in furtherance of their scheme These wire communications [were] in interference of interstate and foreign commerce in violation of 18 U.S.C § 1343." (¶ 259).

Applying the standards set forth above, even a cursory review of the Complaint reveals certain deficiencies. With respect to the assertions of bribery, as this Court observed in *Zigman v. Giacobbe,* 944 F.Supp. 147, 156 (E.D.N.Y.1996).

> Reading these allegations in the light most favorable to the plaintiff, the Court finds that they fail to state a predicate act for bribery [under civil RICO]. In the[relevant] paragraphs there is not one single factual allegation of a *specific* bribe paid to any [Town Official] at any time. Rather, paragraphs [243] through [255] constitute nothing more than vague, general and conclusory allegations insufficient to put a defendant on notice of any alleged wrongdoing. Accordingly, there is alleged no predicate act of bribery sufficient to support the [plaintiffs'] RICO claims.

 Simply put, there is no indication of who paid the bribes, how the bribes were furnished, when and where the bribes were paid, and the approximate value of the bribes, Moreover, While there is a baldly stated accusation that some bribes took the form of "illicit campaign contributions," there is no explanation as to the who, what, where, when, why and how of the contributions. Nor is there any explanation, as far as the Court perceives, as to the illicit nature of the contributions. Indeed, there is nothing aside from the plaintiffs' wholly conclusory and self-serving contention that the "contribu-

tions" were illegal. Equally nebulous is the wire fraud allegation, which offers no insight as to who engaged in the phone conversations, when they occurred, or what the substance of the conversations were.

Conceding that the Complaint is devoid of detail on this score, the plaintiffs nevertheless assert that "the specific time, place and amounts of the bribes paid ... is not a requirement of the pleading." (Plaintiffs' Memorandum of Law, at 12). The sole authority offered in support of this argument is *American Equitable Life Insurance Company v. Transamerica Occidental Life Insurance Company*, Civ. 88–1620, 1989 U.S. Dist. LEXIS 16540 (N.D.Tex.1989), an unpublished opinion from the Northern District of Texas. Aside from the obvious fact that the decision is not binding on this Court, a review of the opinion reveals that it is mischaracterized in the plaintiffs' Memorandum. In *Transamerica Occidental*, 1989 U.S. Dist. LEXIS 16540, the District Court disagreed with the defendants' contention that the plaintiff's pleading failed to provide the specifics of the bribery allegations Rather, the Court found that the complaint "pleaded in detail the discussions the parties had relating to how much each of them was to receive [in the form of bribes], how the money would be laundered, and how it would be delivered." Nowhere in the opinion does the Court opine that a RICO plaintiff may be relieved from pleading such particularities.

The impermissible ambiguity is exemplified further by the plaintiffs' insistence upon grouping the defendants into one category, without differentiating between their various roles. To illustrate, the plaintiffs state that the "The *Commercial Defendants* conspired to bribe the *Town Defendants* and the principals of the Commercial Defendants did in fact forward bribes in exchange for influence." (¶ 243) (emphasis added). However, as discussed above, to establish a pattern of racketeering activity, the plaintiffs must allege "that *each defendant* was involved in two predicate acts." *Wasserman v. Maimonides Medical Center*, 970 F.Supp. 183, 189 (E.D.N.Y.1997) (emphasis added) (citations omitted). With regard to the substantive RICO violation, by using pleadings that do not differentiate between defendants, "plaintiffs neglect that the focus of section 1962(c) ... is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise." *Morin v. Trupin*, 747 F.Supp. 1051, 1065 (S.D.N.Y.1990) (internal citations and quotations omitted). Similarly, to plead a violation of RICO's conspiracy provision, Section 1962(d), the Complaint must allege that each "defendant embraced the objective of the alleged conspiracy, and *agreed to commit two predicate acts* in furtherance thereof." *United States v. Viola*, 35 F.3d 37, 43 (2d Cir.1994) (citation omitted) (emphasis added), *cert. denied*, 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995). Accordingly, should the plaintiffs opt to file a Second Amended Complaint, they must indicate specifically how each defendant participated in, or within the context of a conspiracy agreed to participate in, at least two predicate acts, and detail the exact nature of those predicate acts, including the who, what, where, when, why and how of those acts.

## III. CONCLUSION

Having reviewed the parties' submissions, and hearing oral arguments, and for the reasons set forth above, it is hereby

**ORDERED**, that pursuant to Rule 8 of the Federal Rules of Civil Procedure, on the Court's motion, the Complaint is dismissed, without prejudice, and with leave to file a Second Amended complaint within thirty (30) days from the date of this Order, namely, on or before August 14, 1998 by 5:00 p.m.; and it is further

**ORDERED**, that the defendants' motions for dismissal pursuant to Rules 9 and 12(b) of the Federal Rules of Civil Procedure are denied, without prejudice and with leave to renew after the plaintiffs file a Second Amended Complaint.

**SO ORDERED.**